Case No. 23-1100, et al. Stern Produce Company, Inc. Petitioner v. National Labor Relations Board. Mr. Scully for the petitioner. Mr. Weitz for the respondent. Mr. Scully. Good morning and may it please the Court. The National Labor Relations Board has applied a presumption of guilt to a small family-owned produce company in Phoenix, and accordingly, their order is not supported by substantial evidence. To suggest that a union only files meritorious unfair labor practices is to deny a modern reality. It's true that the agency years ago found numerous violations committed mostly by a consultant, Stern, unfortunately hired in 2015. However, the agency has also dismissed numerous allegations levied against Stern in the same time frame and since. Obviously, the company cannot claim its prior compliance should excuse its conduct in this case. Why does the agency get to conclude that no employer who has previously violated the law can ever act lawfully again? Administrative Law Judge Montemayor got it right. There's no evidence of discrimination here unless you consider the egregiously insensitive and discriminatory outbursts of Mr. Ponce, his homophobic, racist, and Islamophobic rant towards other drivers. This agency seems to suggest that Stern made all of this up or embellished the circumstances, but we asked to what end? So we could sustain a written warning? Were the statements of Mr. Ponce not offensive enough? The board has departed from its precedent and by essentially removing causation from the initial right line tests and further by deconstructing Stern's legitimate reason for discipline in the requiring a quantum of proof that's more akin to beyond a reasonable doubt than a preponderance of the evidence. Add to this this agency's completely unsubstantiated and unique claim that asking an employee to uncover a camera that has been in the employee's cab for years reasonably creates the impression of surveillance. Let me ask you about that. We don't know from the record, do we, why Ruiz covered his camera? We do not, Your Honor. Okay, and why isn't it a reasonable inference that he covered it because he thought he was being watched? Well, I think that's. We've got cameras all over the world and we're probably obviously when we don't know it. But that's my question is, why did he cover it? And I don't think the record indicates that he covered it every time he had a lunch break. It does not, Your Honor, and there's no record evidence regarding that. The fact of the matter is, is that those cameras were installed years before. And in fact, the union filed an unfair labor practice charge over that, which was withdrawn, which is usually means it's on pain of dismissal. So, for years, he knew that he was being watched at all times. And moreover, in his testimony, Mr. Ruiz suggested that he could be observed, even though he had covered up the camera. Because of the record itself, it's clear that no one knew that he was on break. The only thing that is indicated is that the text message sent from Mr. Barr was about uniform sizing initially. And in that regard, he also added the phrase don't cover your camera, which is set forth in the driver's manual that Mr. Ruiz testified he knew about. He knew that the camera was to remain on at all times in his his direct and cross examination. I think, Your Honor, that this case demonstrates why appellate review of NLRB orders cannot be a rubber stamp. What happened in this case is that the agency simply decided to find violations based on Stern's prior violations and alleged conduct in a settled case. Consider the reverse. If an agency dominated by employer interests overturned clear violations because it regarded the employer to be largely compliant with the act in prior cases, obviously, that could not stand. This court has pointed out that while the substantial evidence test is not modified every time the administrative law judge and the board disagree, the ALJ's rejected factual findings are a factor for the court to consider. And I asked the court to pause on the quantum of factual findings by the administrative law judge that the board overturned. Here are some of them. That it was not out of the ordinary for the company to require the in-cab camera to remain uncovered. That a reasonable person could not conclude that the following message could give someone the impression of surveillance. Quote, got the uniform for sizing bud and you can't cover the camera against it's against company rules, end quote. That Mr. Ruiz could not have known that Mr. Barr did not normally check the cameras as that testimony only came out during the hearing. That there was no evidence that supported a conclusion that Mr. Ponce's written warning was in retaliation for union or protected activity. That Mr. Ponce's at least three clear violations of the policy were not comparable to other lesser violations of the anti-discrimination policy. That Stern does not follow a strict progressive discipline policy. That Mohamed Chayko, the target of the comments of Mr. Ponce, was legitimately bothered by the comments. That Stern would have taken the disciplinary action regardless of Mr. Ponce's alleged union activity and activity with the board. These are all the pertinent factual findings of this case. In short, the agency's position amounts to innuendo based on Stern's prior conduct. There's an oral reprimand. Does the supervisor or the company employee make a note of that in the individual's personnel file? Yes, Your Honor. There's actually a form. And I think that one of the mistakes that the agency made in this case, Judge Randolph, is that it concluded that because the form indicated a verbal counseling, that it applied a strict disciplinary policy. But during the hearing, the agency had subpoenaed all the pertinent managers of the small company and had ample opportunity to establish that there was a progressive disciplinary system. There was not. There were cases that were elevated. And I think that what you're getting to, Judge Randolph, is the disparity that the agency tried to point to regarding the discipline of an employee by the name of Andre Woods. And the agency tried to say that Andre Woods had been given a prior discipline. He had not been given a prior discipline and pointed to two violations of the anti-discrimination policy result in a written warning. In Mr. Ponce's case, there were arguably three. The comments that stereotyped gay people, comments that assumed Mr. Daco was of Arab descent or Muslim faith, and then also, of course, suggesting that Muslims want to kill gay people. I'm looking at the anti-harassment policy of the company, which says discipline may include, but it's not limited to, reprimand, suspension, demotion, transfer, and discharge. So Ponce's discipline was which one of those? Was it a reprimand? Yes, it was a written warning. So why does it matter whether it's written or oral if that's going into the individual's file anyway, if it's oral? Well, I think that that's the point, Your Honor, that there was this unusual deconstruction of this small company's disciplinary policies. A written warning, again, is a lower form of discipline. I would suggest very modest under the circumstances of this case to essentially, in other circumstances, an individual would likely be terminated for saying these things in the workplace. I did try to reserve two minutes. I just would like to sum up. On the law, if I may, there's no— I have another question about the other, the camera surveillance thing. Is it in the record that the company supervisor can communicate in sort of a Zoom-like fashion by looking at a person and talking to them on the telephone? There's no audio for the camera, Judge Randolph. But when the supervisor pulls up a driver, a live feed of that driver's front-facing and cab-facing camera comes up, and that is in the record and also was the subject of this paragraph. Yeah, but the reason I'm asking is because the message that was sent dealt with as uniform was ready or something like that. Yes, sir. And I guess you could inform them of that simply by the telephone itself, right? Indeed. It appears that Mr. Barr texted Mr. Ruiz about the uniform sizing once he had determined that Mr. Ruiz was in a stopped status so that he could receive the text message, but the record does not provide that detail. Okay. But isn't it also true that this Barr—because that's what I was wondering. When he texts drivers, which he testified to that he did regularly, he checked first on the camera to see if they were stopped and so forth. Doesn't the record reflect that he'd never done that before? The record just reflects that he didn't recall sending the particular text in this case, Your Honor. It's somewhat limited on the details. He said that he had circumstances in which he checked the camera involving short stops and things of that nature. Okay. Thank you. Mr. White? Good morning. May it please the Court? Eric White on behalf of the National Labor Relations Board. This case involves two narrow unfair labor practices based on fact-bound inquiries by the Board, which are subject to the familiar substantial evidence standard of review, which, as this Court has recognized in cases cited in our brief, is even more opposite than normal in these specific factual contexts where the Board is evaluating the impact of an employer communication on an employee and evaluating potential discrimination. Turning first to the impression of surveillance violation involving Mr. Ruiz, the very first point I was going to begin with was the question you asked, Judge Henderson, about what the record shows in this case. Many of the employer's claims against the Board's findings are based on factual assertions that simply have no support in the record. As to the question of Mr. Barr's practice, I think Mr. Barr's testimony is very persuasive in this case as to the Board's findings. Number one, as Your Honor noted, he testified at Joint Appendix 274 that he regularly texted and called employees during the day, given that they were out in their trucks and he needed to communicate with them. At the same time, he testified at Joint Appendix 270, Joint Appendix 275, that he simply did not access these cameras normally. He very clearly testified that these cameras were a safety device. The footage that they recorded were a safety device, which was meant to be used in case of an accident, so you would have coverage for liability for the driver and for the company, and you could show that an employee was not on their phone, etc. What was the one about if he stopped for two hours? Because as I understand it, this camera is computerized. I mean, nobody's actually looking at the camera, but the camera tells somebody that a driver has stopped for two hours or more. What's the purpose of that? Is that a frolic of his own or something, or what? I mean, I guess he has the ability to access the cameras, and he testified how the system works. It's a camera mounted on the center of the windshield, which shows the entire cab. It's on 24-7, even when the truck is off, because it also serves as an anti-theft device. It's always running and recording, and this company, Samsara, has fleet software that you need to enter a user ID and password and log in and deliberately go in and pull up an individual driver, and if you do that, you can see the camera. That's not what I'm asking. I'm asking what purpose the company policy of checking the camera or the camera alerting them when somebody has stopped for two hours or more. Yeah, I don't know if that was a formal policy. Mr. Barr testified that that was his practice in response to a question of what were these scenarios when you would ever look at someone's camera. All right. Did he say why he followed that particular policy? Yes, I believe his testimony was if something is abnormal, like a driver is in an area they're not supposed to be or has been stopped for a long time, he can check on them. There's no claim that that was the situation here. Mr. Ruiz was just stopped for his regular lunch break, and I'd also note that I think tellingly, Mr. Barr denied having ever sent this text, and the employer did not examine him and elicit testimony about the circumstances of this text. So, the claim that on this circumstance, the reason that he was checking the camera was to make sure Mr. Ruiz was stopped in order to text him, that simply has no basis in the record and is actually directly contrary to his testimony about what his normal practice was. We don't actually have anything in the record explaining why Mr. Barr accessed the camera at all, which was a key component of the board's finding that this was highly unusual and would have been perceived as such by Mr. Ruiz or a reasonable employee in his circumstance, because there's no evidence of the employer having ever indicated to an employee that just while they were going about their regular job duties, they were being watched. Nor is there any... Why did Ruiz cover the camera if he didn't think he was being watched? Well, he testified that it was on his lunch break. The understanding was that these cameras are for safety purposes. That's at Joint Appendix 456, where he's affirming that he had an understanding of why these cameras were in the truck, which is that while you're driving and moving, it's a safety device. So he testified that he did cover it for privacy, but I don't think that supports the employer's further assertion that that means he thought he was being watched all the time and this was totally normal. For example, I'm sure many of us in the courtroom have cameras on our personal laptops and may feel some type of... I think many people cover their camera out of some ambient concern about privacy. That doesn't mean they actually believe they're being watched at all times for no reason. This was the only instance in the record of an employee having been sent that message or told that that was the situation. And also, I would note that Mr. Ruiz clearly testified, and there's no evidence to the contrary, that he had never been instructed that he couldn't cover his camera during his lunch break. That brings up footnote seven in the board order, which I think is an absurd position. The board says, but the manual says when it can be turned off or disconnected. And you have to be specifically authorized for that. Then it says, but the manual does not address employees covering their cameras during break periods. And why doesn't the greater subsume? I mean, it doesn't say you can't turn it backwards or you can't turn it upside down either. I mean, if you can only disconnect or turn it off with authorization, that has to include and you can't cover it either. Well, Your Honor, I think it's less absurd. Once you go through Mr. Barr's testimony, I'd point the court to Joint Appendix 251 to 266, where he explains the purpose of these cameras and how they work. They're on and connected to the truck's CPU 24-7. And so, as I mentioned earlier, even when the truck is parked and no one's in it, the cameras are running. They're meant to be on as an anti-theft device. So they're just always on and not disconnected. Well, they can be, though. They can be just obviously. Correct. Yeah. And so I think the policy, and I think it's a reasonable reading of the policy, is that it's saying don't unplug this camera and disconnect it. That's what is specifically being prohibited. But it doesn't say we need to be seeing you at all times so we can randomly check your camera and check up on you. As I noted earlier, at Joint Appendix 456, Mr. Ruiz, consistent with Mr. Barr, explained that everyone understood the purpose of these cameras were for liability in case of accident, for traffic safety. So there's no reason that an employee would have believed that part of the purpose of having the camera was so that while he's parked for lunch, his employer can check in on him. I'd also note in response to your question, Judge Randolph, there was specific testimony that this is not a Zoom-type device where you can communicate back and forth. It's a soundless camera, and the actual communication occurred through the employee's cell phones through texting or calling. What evidence did the board have to indicate that the cameras were used for surveillance of union activities? Well, they didn't – the board didn't find an actual surveillance finding, Your Honor. They found an impression of surveillance. So there was no specific finding that actual union activity – or assuming or having the impression that he was being watched for engaging in union activities. I think the board considered the totality of the circumstances. And so, number one – Well, I hope they do. Yeah. I mean – Well, that is the board – That's a totally empty phrase. I mean, who knows of a case that didn't consider the totality of the circumstances? That's fair enough, Your Honor. I only pointed out that there's not a specific – you know, the board considered the full context here. And so, number one, you had the fact that Mr. Ruiz had been a longtime union supporter. He'd been a previous target of unfair labor practices, and he had just returned to work less than three weeks before this incident as a result of a settlement alleging that he had been unlawfully bailed to be recalled from a layoff because he was a union supporter. So, if you're a union supporter, you can cover the cameras? Is that the idea? No. Because otherwise, you might be thinking, oh, my goodness, I'm being watched. Well, that's the first circumstance. But I think the second circumstance, and which is consistent with board law in this area as well as this court's law, is that when an employer does something out of the ordinary, that can convey an impression to a reasonable employee that they are being targeted in connection with their protected activities. So, if the employer had regularly done this and regularly told employees that you cannot cover your camera or sent them messages indicating that they were being watched on their breaks, that would likely not be an unfair labor practice. But as I was discussing earlier, what's significant about this case is that – It was a manual that said you have to keep the cameras on at all times? Well, that's where the board had a different interpretation of that manual. I think it's reasonable to infer that what the manual is saying is you cannot disconnect this device. But there's no evidence that employees had received a general instruction, certainly not Mr. Rees. He specifically testified to the contrary, that he could not cover his camera while he was stopped and not moving in his vehicle, which is contrary to the understood purpose of these cameras, which is a traffic safety and liability device while the vehicle is moving and you might have a traffic access. So, this camera only showed what was going on within the cab itself? Well, there's a forward-facing camera that watches the road and an inward-facing camera, which the testimony was – So, for example, if you're in a traffic accident, you want to have a recording of the driver to show that the driver was not on his phone, that no one can make a claim against the driver or the company, et cetera, so that you're protected. And Mr. Barr was very clear that that's the purpose of the camera and the abnormal situations when he actually checks the camera. If there's an accident or a harsh braking event or, Your Honor's question, other unusual situations like a driver being stopped somewhere for a very long period of time, he did not check them just as a normal course of his job duties or explain why he did in this situation. Let me ask you this. I thought you said – I want to get your answer clear to Judge Randolph. The driver safety manual requires, quote, all vehicle safety systems, telematics and dash cams must be rain on at all times unless specifically authorized to turn them off or disconnect. Now, did you say that Ruiz had no knowledge of this thing that's in the manual? No, Your Honor. I was just making the point that I had been making earlier that the board's reading of that language is that the employees cannot turn this device off or disconnect it, which is different than leaving it unobscured while they're parked in their truck. The device here was still running. And we've been through that. Correct. If you're told and you know, don't turn this thing off, that included in that is don't cover it. Don't play with it. Don't break it. I mean, I don't know how specific they have to be. I want to ask you about the board order on J718, left column, the last full paragraph on the left column. The general counsel alleged that under these circumstances bars July 13th Internet interaction with Ruiz unlawfully created the impression that Ruiz and then it says in any of his potential union activity was under surveillance. Now, if he hadn't been on his lunch break, he would have had no business being involved in union activity. I mean, he's on an eight hour work shift and. But for the word potential. He isn't supposed to be engaged in union activity while he's driving this truck. Yes, your honor. And my question actually, I think, addresses both components of what you just said. Both the fact that you could read the policy as saying employees can't cover their camera. And you could say that employees, while they're on working time, can be observed. That's true. But the board's finding here was actually broader than a finding that when Mr. Bar access the camera, he might have accidentally seen union activity. What the board found here was an 801 impression of surveillance, which is that the mere message to an employee that they're being singled out and watched has a reasonable tendency to coerce employees, even if he was not engaged in union activity at the time, or even if he had never engaged in union activity in the past in his truck. What a mere what union activity could possibly be picked up by this camera? He's off in the truck. He's either driving or he's having lunch by himself. This is surveillance targeted perfectly not to pick up protected activity. Well, I don't think the record shows that, your honor. This is the driver's primary work site throughout the day. So, as we know, the truck, so people, coworkers are coming into the truck to sit with him to organize during his lunch break. Well, your honor, as we know, in our brief, they could be having discussions. Camera wouldn't pick up the audio. Well, I wouldn't pick up the audio, but I would submit that if still, even if it doesn't have audio, the fact that your employer is watching, you have a conversation still highly coercive. Your employer has a camera pursuant to a generally applicable previously published policy with all sorts of perfectly legitimate business justifications. Well, again, as I was noting, completely different from the case where, you know, someone three levels up the chain of command all of a sudden is sitting in the passenger seat for a ride along. Sure, your honor, but what that case was going to, which is, I think, similar to this case, which is that you can have coercion, even if there's not actual surveillance of union activities. The mere message to an employee that they're being singled out and monitored, monitored more closely than normal is coercive under existing law. Your theory on the first charge is not discrimination based on union activities. It's that the employer is surveilling union activities, and I just don't see what activities are. Respectfully, your honor, that's that's not the unfair labor practice that the board found. There's a delineation under board law between an actual finding of union surveillance and an impression of creating an impression of surveillance of protected activity. Correct. Creating hard inference if the camera is targeted to times and places where it's very unlikely that there will be protected activity. Well, your honor, I would again push back against the factual assertion that is very unlikely here. But I think the cases support the board's finding that even if he had not in the past engaged in union activity, or even plan to in the cab of his truck, it's still coercive. If your employer, which has never done to any other driver is indicating that it is watching you during the day. So, for example, this court in Parsippany Hotel affirmed a similar finding where guards began following employees around throughout the workday and essentially intimidating them. And Mac Arden, this court affirmed an unfair labor practice where employees were told that while they're going about the facility, they might be recorded when, in fact, I wasn't even true. And that was not tied to any specific instance of union activity. What the court affirmed there correctly was that that is coercive to employees because you are singling them out in a way that you have not done to any other employee. So, again, even if this was even assuming there was a rule against covering your camera, there's still no explanation as to why Mr. Ruiz was out. And I think that's the board have a acknowledge the de minimis doctrine. Where where one would say that this is so trivial that we're not going to bother with. I mean, the board does have a merit dismissal procedure. Honor. I would think this is a more straightforward done for a labor practice. But I think the flip side of that is that the remedy here for the employer is also comparatively mild. It's just a notice posting, telling employees that it won't create an unlawful impression of surveillance. It won't create impressions anymore. Well, it is specifically what the order said. Yes, specifically that it will not violate federal law by trilling. Unless I misremembered it. I think it says. Season does this from creating the impression that it's engaging in surveillance? Well, that's the board's order. And then there's a concurrent notice posting. They'll actually be posted in the facility. Yes. So there is if you took the cameras out of the cab, then I guess you wouldn't be able to create that impression anymore. Well, no, you could. The board's orders is not in any way prohibit the employer from using these cameras as it sees fit. If the employer were to promulgate a generally applicable rule that it had never done prior to this. How about a rule that says don't disconnect or turn off the camera? That's a pretty general rule, isn't it? Certainly, your honor. But again, there's there's two components to this case, even if there is a generally applicable rule. If we assume that's the case, that does not explain why Mr. Barr accessed Mr. Ruiz's camera here. He testified that he did not normally access employees cameras. And so why was Mr. Ruiz singled out or why would he reasonably believe he was singled out? And that's the board's finding here, which I would submit is well supported by substantial evidence, given the deferential standard of review. And I see that I'm obviously well over my time. If the court has any questions about the one last question, has this election been held? Well, there was an election in the in the time frame of certain produce one. There has not been a well, there has not been a subsequent petition. But I would note that the organizing campaign is active, contrary to employers claims. And if there's no questions about Mr. Ponce's on for labor practice. Thank you. Thank you. You take two minutes. Thank you, your honor. I'll be very brief. I just wanted to address what the council for the board spoke of in his argument. The testimony of Mr. Barr is all post hoc. The standard is what is the impression that the employee has a reasonable employee at the time? And the only evidence in the record is the text message that was sent. And so what the board should have looked at is, does that in light of the prior dismissed unfair labor practice charge over the installation of these cameras? And in light of Mr. Ruiz's acknowledgment at joint appendix, I think, four fifty six, where he said, yes, I, I read and understood the driver's manual. Does that text create in a reasonable employee the impression of surveillance when they know all these things? And we simply contend that it cannot in these circumstances. And we ask that the petition be granted and the cross petition be denied. Thank you. Thank you.
judges: Henderson, Katsas, Randolph